IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA** )
)
v. ) 2:19cr144
) **Electronic Filing**
**FRANKIE LEON MORRISON** )

**OPINION**

On May 14, 2019, a grand jury returned a three-count indictment against Frankie Leon Morrison ("defendant"). Defendant is charged at count one with possession of a firearm by a convicted felon, on or about April 8, 2019, in violation of Title 18, United States Code, section 922(g)(1); at count two with possession of a firearm by a fugitive from justice, on or about April 8, 2019, in violation of Title 18, United States Code, section 922(g)(2); and at count three with possession of stolen firearms and ammunition, on or about April 8, 2019, in violation of Title 18, United States Code, section 922(j). Presently before the court is defendant's motion to suppress. An evidentiary hearing was held on the motion on August 18, 2021, after which the parties filed supplemental submissions on September 22, 2021, September 28, 2021, and October 12, 2021. After careful consideration of the entire record as developed, the motion will be denied.

The charges stem from the arrest of defendant by officer John Gillette of the Buffalo Township Police Department, Butler County, Pennsylvania. Buffalo Township is located approximately 25 miles northeast of Pittsburgh, Pennsylvania, and is comprised of rural and suburban areas, including eight to ten neighborhoods with developed housing plans.

Officer Gillette became employed as a Buffalo Township police officer in the spring of 2017, after spending a few months as a police officer for Freeport Borough in Allegheny County,

Pennsylvania. As part of his duties, Officer Gillette regularly patrolled the various neighborhoods of Buffalo Township and had gained a familiarity with each of them. Transcript of Suppression Hearing (Doc. No. 67) ("Tr.") at p. 32, lines 6-25 ("Tr. at 32:6-25").

In or shortly before April of 2019, the Buffalo Township police department received multiple reports involving the theft of property from automobiles. The thefts had occurred between 1:00 a.m. and 5:00 a.m. in the housing plans in Buffalo Township. A citizen had presented to the police department video footage on a cellular telephone capturing what was believed to be one of the thefts in progress. The footage revealed a tall, suspected thief dressed in dark clothing carrying a backpack. Other captured footage from prior thefts suggested that some of the thefts had been perpetrated by multiple accomplices. Officer Gillette had viewed the cell phone footage, but the video was not preserved. Tr. at 34:15-20, 39:17-22, 78:1-80:14.

On April 7, 2019, Officer Gillette began a midnight shift which ran from 11:00 p.m. on April 7 through 7:00 a.m. on April 8, 2019. As was customary, he started the shift by patrolling the various neighborhoods of the township in a marked patrol car. Due to the recent thefts, Officer Gillette was on the lookout for any indicators of theft-related activity. Tr. 34:1-21

At around 3:00 a.m., Officer Gillette proceeded into Ridgeview Estates, which was one of the housing developments that he frequently patrolled. The sole way in and out of the housing development for vehicles consisted of proceeding from the intersection of Reimer Road and Pasture Crossing Drive. Tr. at 46:15–19; see also Hearing Slides (Hr'g Slides") at 2.

At approximately 3:15 a.m., Officer Gillette observed a male standing inside an open door on the driver’s side of a Nissan car parked in the driveway at 113 Pasture Crossing Drive. This house was less than a quarter mile from the entrance into the neighborhood. The individual was tall, dressed in dark clothing, wearing a backpack, and appeared to be "reaching around for stuff

in the vehicle," which Officer referred to as "going through" the inside of the vehicle. Tr. at 35:1-36:14. Officer Gillette called out to the man to determine if he was permitted to be there. The man immediately ran between the houses at 113 and 115 Pasture Crossing Drive and in the opposite direction of Gillette, leaving the driveway and disappearing into the grassy yards between the houses on Pasture Crossing and Mohawk Drive. Tr. at 38:8-24. Based on this conduct, Officer Gillette formed the belief that the man did not have permission to be there, and more importantly, did not have permission to be in the Nissan. Tr. at 101:3-21. At that time, it was dark and cool and there was dew on the grass. Tr. at 92:10-13.

Officer Gillette radioed dispatch for assistance and continued in his patrol car westbound on Pasture Crossing Drive before turning left on to Cabin Lane, which was located about 200 yards from the original encounter. Tr. at 39:6–25; 41:18–21; 54:15–21; see also Hr'g Slides at 5, 6. As he proceeded on Cabin Lane Officer Gillette spotted a parked black Chrysler Sedan with Pennsylvania registration KLZ 7299 ("the Chrysler"). Tr. at 40:6–11; 42:15–19; see also Ex. 4, Photograph of Chrysler Sedan. The Chrysler was parked partially on the road and partially on grass near a berm in a location where Officer Gillette had not seen a car parked during the two years he had patrolled that neighborhood. Tr. at 40:12–41:3; 100:5–10; see also Hr’g Slides at 6–9; Ex. 5, Photograph of Location of Chrysler. The Chrysler had not been parked there when Officer Gillette patrolled the neighborhood two hours earlier at approximately 1:00 a.m. Tr. at 41:5–13.

Officer Gillette radioed the license plate to dispatch. Tr. at 44:11–13; see also CAD Rep. at 1. He then learned that the Chrysler was registered to an individual with a Pittsburgh address. Tr. at 44:16–20; see also CAD Rep. at 3. He remained in his patrol car and used its search light

in an effort to determine if anyone was in the Chrysler; he did not see anyone in the car.  Tr. at 44:21–45:10; 95:25–96:8.

Officer Gillette then drove south on Cabin Lane towards Mohawk Drive and continued to search for the individual he had just seen at 113 Pasture Crossing Drive.  Tr. at 45:13– 17; Hr'g Slides at 10.  He turned left on to Mohawk Drive and then right on to Pasture Crossing Drive, exiting the Ridgeview Estates neighborhood on to Reimer Road.  Tr. at 45:23– 25; see also Hr'g Slides at 10.  Once on Reimer Road, he looked for anybody driving in a vehicle in any direction, and, after not observing any vehicles, he looped back around on to Pasture Crossing Drive and reentered Ridgeview Estates.  Tr. at 46:22–25; 47:3–9; see also Hr'g Slides at 11.

Upon reentering Ridgeview Estates Officer Gillette observed the black Chrysler that had been parked on Cabin Lane travelling southbound on Pasture Crossing Drive towards him at approximately 10 to 25 miles per hour.  Tr. at 46:1–9; 47:7–24; 51:19–20; 52:14–18; CAD Rep. at 1; see also Hr'g Slides at 11.  Less than fifteen minutes had passed between his initial encounter with the individual going through the Nissan and the observation of the Chrysler being driven in a direction toward the exit from Ridgeview Estates.  During that time Officer Gillette had not seen any other person in the area.  Tr. at 49:2–8.

Believing that the driver of the Chrysler was connected to the incident involving the parked vehicle at 113 Pasture Crossing Drive, Officer Gillette activated his emergency lights and attempted to initiate a traffic stop on the Chrysler, which was traveling in the opposite direction.  Tr. at 48:3–7; 51:15–20.  Once the patrol car's overhead lights were activated, the Chrysler slowed down but did not stop.  Tr. at 48:8–15; 52:7–9.  As the approaching cars traversed to the point where they were approximately ten to fifteen feet away from each other (in the opposite lanes), the driver of the Chrysler, later identified as defendant Frankie Morrison, yelled through

his rolled down driver's-side window, asking why Officer Gillette was trying to stop him.  Tr. at 48:16–21; 52:23.  Officer Gillette yelled back and ordered defendant to stop his vehicle.  Tr. at 48:22–23.  Defendant continued driving at a slow rate of speed.

Believing that defendant did not intend to stop, Officer Gillette jumped out of the patrol car and again ordered defendant to stop.  As defendant continued to proceed forward in the Chrysler, Officer Gillette drew his pistol. Tr. at 50:14–51:4.  After Officer Gillette drew his pistol, defendant stopped the Chrysler near the corner of Pasture Crossing Drive and Reimer Road.  Tr. at 51:5–14; see also Hr'g Slides at 11.

Officer Gillette approached defendant and ordered him to get out of the car at gun point and defendant complied.  Tr. at 51:7–9; 82:3–8.  When exiting the vehicle, Officer Gillette observed that defendant's shoes and the bottoms of his pants were and wet and muddy, and his face was dripping with sweat - as if he had just been running for some distance through yards filled with damp grass.  Tr. at 53:15–19; 92:22–93:2.  Based on his appearance, Officer Gillette formed the belief that defendant was the individual who ran from 113 Pasture Crossing Drive.  Tr. at 53:23–54:3, 92:7-93:2.

Officer Gillette immediately handcuffed defendant and placed him in the back of the patrol car.  Tr. at 54:4–11.  Backup arrived shortly thereafter (a few minutes before 3:30 a.m.).  Tr. at 54:21–55:2; see also CAD Rep. at 2.

Officer Gillette then walked up to the Chrysler and peered into the passenger's-side window, which was rolled down.  Tr. at 54:22–55:24.  From outside the car, he observed in the front passenger-seat an open backpack and could see that it contained a wallet, some coins, and gift cards.  Tr. at 56:3–25.  He then entered the vehicle, looked in the backpack, and found additional items that included a cupholder and a loaded pistol magazine.  Tr. at 57:6–10.  He

opened the wallet and discovered an identification card belonging to an individual who lived at 111 Pasture Crossing Drive, which was next to 113 Pasture Crossing Drive where he had first encountered the tall male reaching into and "going through" the Nissan. Tr. at 57:11–23. Officer Gillette then placed defendant under arrest and read him his Miranda rights. Tr. at 57:24–58:8. Defendant then stated that he was working as a jitney driver and he had just dropped off two males. He added that he did not know how "that stuff" got into the Chrysler. Tr. at 58:11-17.

Officer Gillette asked dispatch to submit defendant's driver's license for background verification. Tr. at 58:18-25. Dispatch indicated defendant had active arrest warrants, and, based on information relayed from dispatch, Officer Gillette formed the belief that the warrants were extraditable. Tr. at 59:2–4; 89:9–20; 90:1-8. He would have detained defendant on this basis as well. Tr. at 60: 1-11.[1] Officer Gillette transported defendant to the Butler County Jail and had the Chrysler impounded at Sarver Automotive. Tr. at 59:5–23.[2]

Gillette's shift ended at 7:00 a.m. and his next shift began at 11:00 p.m. that same day. Tr. at 60:24–61:2. After midnight on that shift Officer Gillette drafted and signed the probable cause affidavit and search warrant application for defendant's car. Tr. at 61:1–62:1; see also Ex. 1, Application for Search Warrant. In doing so, Officer Gillette believed he was subject to the penalties of perjury and at risk for criminal liability if he were to be untruthful in the affidavit. Tr. at 62:23–63:5.[3]

---

[1] The CAD report obtained after the incident showed that extradition was only requested from New York, New Jersey, and New England. See CAD Rep. at 4.

[2] Had Officer Gillette merely detained defendant on the warrants, he would have had the Chrysler impounded and towed to Sarver Automotive on this basis as well. Tr. at 60:8-20.

[3] This was the only search warrant Officer Gillette had ever drafted. Tr. at 62:14–18.

At the end of his shift Officer Gillette left the signed affidavit and warrant application at the police station, which was standard police department protocol; it was established Buffalo Township procedure for a supervising officer to take and present such documents to a magisterial district judge for authorization. Tr. at 62:19–22. Chief Timothy Derringer took the affidavit and application to Magisterial District Judge Sue Haggerty's office for authorization. Tr. at 25:23-27:3.

Senior Magisterial District Judge Peter Shaffer ("Judge Shaffer") received the affidavit and application, reviewed them, and signed the search warrant on April 9, 2019. Tr. at 7:11-8:2. Based on the affidavit, Judge Shaffer believed there was probable cause for the requested search warrant. Tr. at 7:24-8:14.

Judge Shaffer made two errors in completing the warrant. First, although he signed the first section on the first page indicating that Officer Gillette had sworn to and subscribed to the affidavit before him and completed the section authorizing the execution of the warrant prior to April 11, 2019, he did not at that time sign in the space calling for the "Signature of Issuing Authority," nor write in the district identification number and commission expiration date. Application for Search Warrant (Doc. No. 68-1). He likewise transposed the date of April 9, 2016, on the second page of the affidavit. Application, id., at p.2.[4]

Officer Gillette's next shift began at 3:00 p.m. on April 9, 2019. Tr. at 63:21–25. When he started this shift, the warrant as initially signed by Judge Shaffer had been returned by Chief Derringer and placed in the mail slot for Officer Gillette. Tr. at 26:1-27:17; 64:2-12. Officer

[4] Pursuant to a request from Assistant United States Attorney Ross Lenhardt, Officer Gillette contacted Judge Shaffer to correct the failure to sign the warrant in all locations. Judge Shaffer "amended" the warrant by affixing his signature on April 24, 2019. Tr. at 71:9-17;12:1-16; "Amended Warrant" (Doc. No. 68-2) at p.1. Assistant Lenhardt advised Judge Shaffer that he was permitted to correct the oversight. Tr. at 12:6-13.

Gillette examined the warrant and observed Judge Shaffer's signature on the first page of the document; he did not notice that the Judge's signature was missing in the location calling for the signature of the issuing authority.  Tr. at 64:10-18.  He believed the warrant had been properly executed by the Judge.  Tr. at 64:13-21.

At approximately 3:00 p.m. on April 9, 2019, Officer Gillette and another Buffalo Township officer executed the warrant and searched the Chrysler at the Sarver Automotive impound lot. Tr. at 64:22–65:3.  Among other things, the search resulted in the discovery and seizure of two Glock pistols from the trunk of the car that were later determined to be stolen from an individual who lived in Ridgeview Estates.  Tr. at 65:14–66:5; see also Ex. 3, Search Warrant Inventory.

On April 19, 2019, Officer Gillette learned that Judge Shaffer had failed to sign part of the warrant, and as a result, on April 24, 2019, he obtained an amended warrant from Judge Shaffer that included his signature in all locations.  Tr. at 67:19–68:17; 11:12–12:4; see also Ex. 2, Amended Search Warrant.  Judge Shaffer concluded there was probable cause to issue the warrant when it was initially presented by Chief Derringer on April 9, 2019, and his failure to sign it in all locations was the result of inadvertence.   Tr. at 8:11–14; 11:1–5.

Defendant maintains that the initial stop of the Chrysler was not supported by reasonable suspicion let alone probable cause; that Officer Gillette exceeded any justification he had for a stop when he stopped the vehicle at gun point, handcuffed defendant and searched inside the vehicle immediately after the stop; and the information discovered from the illegal seizure of the vehicle and search of the backpack tainted the application for the warrant and all subsequent undertakings, including searching the Chrysler.  Further, the facts and circumstances known at the time Officer Gillette approached the vehicle, viewed the backpack and entered the vehicle

did not amount to a legitimate basis to believe in good faith that the search was one permitted by the Fourth Amendment. Consequently, he asserts the pistols discovered through the execution of the warrant must be suppressed.

The government contends that the initial stop of the Chrysler was based on reasonable suspicion that its operator had engaged in criminal activity. And even if probable cause was required to search inside the vehicle, the facts and circumstances known to Officer Gillette when he opened the door and intruded into the backpack had ripened into probable cause by that juncture. Thus, the intrusion into the backpack was permitted under the automobile exception. Furthermore, the warrant was not rendered constitutionally defective by Judge Shaffer's failure to sign it in all locations and all officers involved acted in good faith in any event. Consequently, it argues that defendant's constitutional rights have not been violated and the motion to suppress should be denied.

Defendant's contention that the initial traffic stop and his concomitant seizure were unlawful under the Fourth Amendment is misplaced. The Fourth Amendment guarantees:

> the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . and that no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend. IV.

The law is settled that a traffic stop constitutes a "seizure" of the driver within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the detention might be brief. Delaware v. Prouse, 440 U.S. 648, 653 (1979); see also United States v. Arvizu, 534 U.S. 266, 273 (2002); United States v. Mosley, 454 F.3d 249, 253 (3d Cir. 2006).

Because an ordinary traffic stop is analogous to an investigative detention, it historically has been reviewed under the investigatory detention framework first articulated in Terry v. Ohio,

392 U.S. 1 (1968). See e.g., United States v. Elias, 832 F.2d 24, 26 (3d Cir. 1987) (describing "Terry-like traffic stop[s]"); United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir. 2006) ("Terry reasonable suspicion standard applies to routine traffic stops."). Under Terry and subsequent cases, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." United States v. Valentine, 232 F.3d 350, 353 (3d Cir. 2000) (quoting Illinois v. Wardlow, 528 U.S. 119, 123 (2000)). Reasonable, articulable suspicion is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," Wardlow, 528 U.S. at 123, and only a "minimal level of objective justification" is necessary for a Terry stop. United States v. Sokolow, 490 U.S. 1, 7 (1989).

Ascertaining whether an officer has reasonable suspicion to effectuate a stop often involves an imprecise judgment. United States v. Robertson, 305 F.3d 164, 168 (3d Cir. 2002). The term is a common sense, non-technical conception that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Ornelas v. United States, 517 U.S. 690, 695 (1996) (quoting Illinois v. Gates, 462 U.S. 213 (1983). As such, the standard is "not readily or even usefully reduced to a neat set of legal rules." Id. At its core, reasonable suspicion requires "some minimal level of objective justification' for making the stop." Alabama v. White, 496 U.S. 325, 329-30 (1990) (quoting INS v. Delgado, 466 U.S. 210, 217 (1984). It is a less demanding standard than probable cause. United States v. Silveus, 542 F.3d 993, 999-1000 (2008) (reasonable suspicion poses a lower hurdle because the level of intrusion on an individual's liberty is less). While reasonable suspicion and probable cause are two different standards, both require the court to make a determination based on the "totality of the circumstances" when assessing whether the requisite

basis existed to justify the police action. White, 496 U.S. at 330; see also Arvizu, 534 U.S. at 273-74. The question is whether the officer had a "particularized and objective basis" for suspecting the conduct in question. Id. at 330.

Officer Gillette had reasonable suspicion that criminal activity was afoot when he initiated the stop of defendant driving the Chrysler. There had been recent thefts of property from automobiles in the township. Officer Gillette had viewed cellphone video captured by a citizen that depicted a tall male suspect intruding into a car while wearing a backpack. He had viewed other cellphone video that suggested more than one actor might have been involved in perpetrating the thefts. He was patrolling suburban housing neighborhoods with which he was very familiar. Around 3:00 a.m., he came upon an individual appearing to be reaching into and searching around the inside of a parked car. The individual was wearing dark clothing and had a backpack. He called out to the individual to ascertain whether the person was connected to the vehicle or the surrounding houses. When he did so, the individual ran in the opposite direction and disappeared into the darkness of the backyards.

Officer Gillette proceeded to drive around the housing development and came upon the Chrysler, which was parked in a peculiar and unusual location that was not associated with any house within the development. Through the assistance of dispatch, he learned that the vehicle was registered to a Pittsburgh address outside the local community, and not to an address within the development. He then traveled out to Reimer Road as if he were leaving Ridgeview Estates. Failing to detect anyone or any other vehicle within his first pass, he looped around and immediately came back into Ridgeview Estates. As he was re-entering the housing development, he came upon defendant traveling in the Chrysler and heading out of the development.

Defendant was driving the Chrysler after 3:00 a.m. and within minutes of Officer Gillette witnessing an individual who appeared to be engaging in the process of searching through a car. This behavior was indicative of an effort to locate personal property as part of committing a theft. It was consistent with the prior reports and images of an individual or individuals committing the same type of thefts. When he called out to the individual, the male ran off into the darkness of the backyards as if trying to avoid apprehension. This individual was a tall male wearing a backpack, which also was consistent with the prior reports and images of an individual believed to be committing the same type of thefts. And the Chrysler/defendant appeared to be the only active automobile/individual in the vicinity at that time.

The above articulable facts and the reasonable inferences that can be drawn therefrom supplied the threshold showing needed for the minimal intrusion generated by an investigative stop. The Supreme Court repeatedly has opined that a police officer has "the ability to briefly stop [a person for which there is reasonable suspicion to stop], ask questions, or check identification in the absence of probable cause." United States v. Hensley, 469 U.S. 221, 229 (1985); see also Adams v. Williams, 407 U.S. 143, 146 (1972) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."). Officer Gillette's initial decision to activate the patrol car's lights and stop defendant in order to further investigate the situation and dispel any concerns about his presence in the vicinity was well within the boundaries permitted by the Fourth Amendment.

Defendant essentially contends that the stop of defendant was converted into a *de facto* arrest that was lacking in probable cause. This position is misplaced on multiple levels.

First, Officer Gillette's decision to draw his weapon in the course of stopping defendant did not convert the seizure into a *de facto* arrest. Our Court of Appeals has observed that "it can be difficult to distinguish between a Terry stop, which requires only reasonable suspicion, and a *de facto* arrest, which must be supported by probable cause." United States v. Johnson, 592 F.3d 442, 447-8 (3d Cir. 2010) (citing United States v. Sharpe, 470 U.S. 675, 685 (1985) (observing that case law "may in some instances create difficult line-drawing problems in distinguishing an investigative stop from a *de facto* arrest"). In this regard, "the vast majority of courts have held that police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest *per se*." Id. (citing United States v. Edwards, 53 F.3d 616, 619 (3d Cir.1995) (collecting cases). "Nor does placing a suspect in handcuffs while securing a location or conducting an investigation automatically transform an otherwise-valid Terry stop into a full-blown arrest. Id. (citing Baker v. Monroe Twp., 50 F.3d 1186, 1193 (3d Cir. 1995) ("There is no *per se* rule that pointing guns at people, or handcuffing them, constitutes an arrest.") and Torres v. United States, 200 F.3d 179, 185 (3d Cir. 1999) ("[I]n certain circumstances officers lawfully may handcuff the occupants of the premises while executing a search warrant.")). Instead, under Terry and its progeny, the focus is on "the reasonableness of the intrusion" after "balancing the need of law enforcement officials against the burden on the affected citizens and considering the relation of the policeman's actions to his reason for stopping the suspect." Id. (quoting Baker v. Monroe Township, 50 F.3d 1186, 1192 (3d Cir. 1995) (citations omitted).

At the time Officer Gillette decided to initiate the stop, he had just witnessed conduct that suggested an individual was in the process of committing theft in a manner similar to a rash of recent thefts in the Township. Defendant was the only individual who was awake and out in the

housing development. He was driving a vehicle that had been peculiarly parked and was headed out of the housing development. The vehicle was not registered to an address within or even near the housing development. The encounter occurred just after it initially appeared that the patrol car had left the housing development. There was thus ample objective justification for a brief investigatory stop to ascertain defendant's identify and his reason for being in the housing development.

Moreover, the intrusion of an initial stop was minimal. Officer Gillette merely attempted to effectuate a traffic stop of defendant. Such a stop did not create any significant burden on defendant. The intrusion of such a seizure on drivers of motor vehicles is, while inconvenient, minimal. Thus, the initiation of a stop of defendant while driving the Chrysler out of the housing development was permitted under Terry.

Officer Gillette's decision to draw his service pistol did not convert the stop into an arrest. Defendant was driving the Chrysler out of the housing development when he became the focus of Officer Gillette. Officer Gillette was proceeding in the opposite direction (i.e., into the housing development). The two cars progressed toward each other at a relatively low rate of speed. As they neared, defendant began to protest the effort to stop him. As defendant continued to move forward, Officer formed the belief that defendant did not intend to yield to the level of authority presented by the patrol car lights. At that point Officer Gillette took the further step of abruptly exiting his vehicle and drawing his service pistol while ordering defendant to stop.

The level of force needed to effectuate the stop was reasonable under the attendant circumstances. Defendant knew Officer Gillette wanted him to stop driving: his protests acknowledged as much. Defendant continued to drive the car forward notwithstanding the level

of authority being utilized.  Defendant's ongoing efforts to evade the effort to stop him added to the articulable facts supporting the seizure and a need for a brief detention.  Cf. United States v. Bonner, 363 F.3d 213, 218 (3d Cir. 2004) ("Flight from a non-consensual, legitimate traffic stop (in which the officers are authorized to exert superintendence and control over the occupants of the car) gives rise to reasonable suspicion.").  Only upon defendant's failure to yield did Officer Gillette utilize an additional level of force to effectuate the stop.  Under the circumstances he was not bound to permit defendant to drive off into the night and the level of force that became necessary to stop defendant was neither unreasonable under the Fourth Amendment nor action that converted the Terry stop into a *de facto* arrest.

The immediate handcuffing of defendant and placing him in the back of the patrol car likewise were reasonable measures permitted under the Fourth Amendment.  "[W]hen police officers make an investigative stop, they may take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." United States v. King, 764 F. App'x  266, 270 (3d Cir. 2019) (quoting United States v. Edwards, 53 F.3d 616, 619 (3d Cir. 1995) (citation omitted); accord United States v. Grant, 256 F. Supp.2d 236, 246 (D. Del. 2003).  Officer Gillette had just witnessed an individual who appeared to be engaged in stealing property from a car avoid contact by running off into the darkness once the individual became aware for Officer Gillette's presence.  Within minutes he came across defendant driving a vehicle that was registered to a distant address and which had been parked in a peculiar location that was not associated with any residence within the housing complex. Defendant protested Officer Gillette's attempt to stop him and submitted to the stop only upon a showing of substantial force.  It was around 3:30 a.m. and Officer Gillette was the only officer on the scene.  The need to secure defendant and the scene would be obvious to any reasonable

officer. Officer Gillette did so by ordering defendant out of the cat, patting him down, handcuffing him and placing him in the back of the patrol car. Given the above and the need to assure that defendant did not have immediate access to a weapon was within the array of actions permitted by the Fourth Amendment.

Moreover, even assuming that probable cause for an arrest was needed at that juncture, it came into existence when defendant exited the vehicle. "Probable cause is a 'fluid concept' that 'turn[s] on the assessment of probabilities in particular factual contexts.'" United States v. Stearn, 597 F.3d 540, 554 (3d Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). Assessing whether it exists in a particular setting involves "a practical, common-sense decision . . . given all the circumstances." Id. (quoting Gates, 462 U.S. at 232).

Probable cause to arrest is present when the known facts and circumstances are "sufficient to justify a prudent officer in believing that the suspect [has] committed or [is] committing a crime." Jones v. Middletown Twp., 253 F. App'x 184, 188 (3d Cir. 2007) (citing Gerstein v. Pugh, 420 U.S. 103, 111 (1975)); Garcia v. County of Bucks, Pa., 155 F. Supp.2d 259, 265 (E.D. Pa. 2001) ("Probable cause exists when the totality of facts and circumstances are sufficient to warrant an ordinary prudent officer to believe that the party charged has committed an offense.") (citing Sharrar v. Felsing, 128 F.3d 810, 817-18 (3d Cir. 1997)); United States v. Cruz, 910 F.3d 1072, 1076 (3d Cir. 1990) (same). The type of crime involved, the nature of the offense, behaviors commonly associated with committing such a crime, and the normal inferences about how such a suspect might behave or act properly factor into the assessment. Stearn, 597 F.3d 554; United States v. Jones, 994 F.2d 1051, 1056 (3d Cir. 1993). Because probable cause is a "practical, nontechnical conception," the task of passing judgment on its

existence is concerned with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Gates, 462 U.S. at 231.

When Officer Gillette ordered defendant out of the car, he complied.  Officer Gillette immediately noticed that defendant was dripping with sweat and his pant-cuffs were wet and grassy, as if he had been running through dewy grass.  There was dew that night and defendant's face being drenched in sweat and his pant-cuffs appearing to be wet with dew and having clinging grass and mud on them made Officer Gillette infer that defendant was the individual that his just ran off and disappeared into the night behind 113 Pasture Crossing Drive.

Of course, "the Supreme Court has never held that unprovoked flight alone is enough to justify a stop." United States v. Navedo, 694  F.3d 463, 472 (3d Cir. 2012) (citing United States v. Bonner, 363 F.3d 213, 217 (3d Cir.2004) (discussing flight in the context of a vehicle stop). But our Court of Appeals has noted that unprovoked flight can contribute to the calculous of establishing probable cause where there are other circumstances that indicate "an individual is engaged in criminal activity." United States v. Acosta, 751 F. App'x 201, 203 (3d Cir. 2018) (citing Navedo, 694 F.3d at 474).  When coupled with the facts and circumstances present at the time Officer Gillette effectuated the stop, the appearance of defendant and his clothing raised an inference that defendant was the individual who disappeared into the backyards at 113 Pasture Crossing Drive when Officer Gillette attempted to make contact with the individual.  The attempt to avoid apprehension initially by running and then by not ceding to the show of authority raised an inference that defendant was engaged in criminal activity.  All of these additional facts and inferences ripened the justification for detaining defendant into one of probable cause to arrest.

Defendant makes much of the fact that Officer Gillette did not "know" that defendant had committed a theft and he had not witnessed a single act of criminal conduct by defendant.  But this position misses the forest for the trees.  It is the totality of the circumstances that supplies the viewpoint from which the propriety of a stop is to be evaluated.  And in this regard, "[t]he Supreme Court has stressed that the totality of the circumstances standard enables 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" United States v. Thompson, 772 F.3d 752, 759 (3d Cir. 2014) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).  Each of the articulable facts or circumstances may be innocent in isolation.  Id. at 758-79 ("[C]ourts are not permitted to analyze factors individually, as innocent factors taken together may appear suspicious to an experienced officer.") (citing Terry, 392 U.S. at 22–23).  It is only the totality of the circumstances as viewed through the knowledge and experience of a trained officer that must serve to eliminate a substantial portion of the innocent explanations and rise to the objective justification needed to satisfy the reasonable suspicion or probable cause standard.  Id. at 759-60.

Here, Officer Gillette did not have a great wealth of prior on-the-job experience; nor did he have significant experience detecting the theft of property from automobiles.  But he had been given reports of prior thefts in the Township through the presentation of captured video by citizens who reported the incidents as such thefts.  And he was well-familiar with the housing developments that he patrolled on a nightly basis.  It was this familiarity that made him recognize that an individual wearing dark clothes and carrying a backpack while "going through" a car parked in a driveway shortly after 3:00 a.m. was unusual, that the individual disappearing into the darkness through the grassy backyards was suspicious and not a response to his verbal

inquiry that would be displayed by a substantial portion of the local citizenry, and that the manner in which the Chrysler was parked as well as defendant's effort to drive it out of the housing development directly after Officer Gillette appeared to have left the development were in combination meaningfully suspicious.  Defendant's failure to stop upon initiation of the patrol car's lights and his sweat-drenched face and wet, muddy, grassy-covered pant-cuffs and shoes augmented that suspicion.  At that juncture the totality of the circumstances gave rise to probable cause to believe that defendant was in the process of attempting to commit such a theft.  That is all that was required for the stop and subsequent seizure of defendant.

Having lawfully stopped and seized defendant, Officer Gillette returned to the car and peered into it.  He observed a pair of black gloves on the console and a dark sweatshirt lying on the backseat that looked wet and dirty.  Affidavit (Doc. 68-1) at 1; Tr. 99:15-20.  He also observed from outside the vehicle's passenger-side window an open backpack and from that location he could see it contained a wallet, some coins and gift cards.  Tr. at 56:16-25.  Only then did he open the door and further examine the contents of the backpack.  This led to the additional discovery of a pistol magazine and a cupholder as well as the fact that the driver's license in the wallet was registered to a resident of the neighborhood who lived at 111 Pasture Crossing Drive, which address was right next to the driveway where Officer Gillette had observed the individual reaching around inside the Nissan.  Tr. at 57:1-23.

Officer Gillette's search of the backpack did not run afoul of the Fourth Amendment. The well-established "automobile exception" recognizes that vehicle searches without a warrant are permissible "if there is 'probable cause to believe that the vehicle contains evidence of a crime.'"  United States v. Donahue, 764 F.3d 293, 299-300 (3d Cir. 2014) (quoting United States v. Salmon, 944 F.2d 1106, 1123 (3d Cir. 1991), abrogated on other grounds by United States v.

Caraballo–Rodriguez, 726 F.3d 418 (3d Cir. 2013) (*en banc*). "The government bears the burden of establishing the applicability of the exception, United States v. Herrold, 962 F.2d 1131, 1143 (3d Cir. 1992), by a preponderance of the evidence, United States v. Vasey, 834 F.2d 782, 785 (9th Cir. 1987)." Donahue, 764 F.3d at 300.

Officer Gillette possessed probable cause to search the contents of the vehicle for evidence of a crime. In addition to the totality of the circumstances that gave rise to reasonable suspicion to effectuate a stop of the Chrysler and those that supplied probable cause for arrest upon defendant's exit from the vehicle and the securing of the scene, Officer Gillette observed in plain view from outside the vehicle personal property which was indicative of the type that a reasonable officer would expect to be present as part of a theft from a parked vehicle: a wallet, coins and some gift cards. This observation served to further augmented the totality of the circumstances giving rise to defendant's lawful arrest. In other words, using a "common sense approach" it would have been clear to a reasonable officer that under the “totality of the circumstances” probable cause existed to believe defendant had just been in the process of committing property theft from the Nissan parked at 113 Pasture Crossing Drive. Thus, the automobile exception applied and provided justification for Officer Gillette to search the content of the backpack.[5]

Moreover, the search of the trunk of the Chrysler did not violate defendant's rights. Officer Gillette had the Chrysler impounded and obtained the warrant signed by Magisterial

[5] The search of the backpack was permitted by a search incident to lawful arrest. "That justification permits vehicle searches incident to arrest if it is 'reasonable to believe evidence relevant to the crime of arrest might be found.'" Donahue, 764 F.3d at 299 n.6 (quoting Arizona v. Gant, 556 U.S. 332, 335 (2009). That exception also was applicable here because the search of the vehicle was at that time limited to the open backpack sitting in the passenger-side front seat. Id. (explaining the similarities and differences between the automobile exception and the search-incident-to-arrest exception as applied to automobiles).

District Judge Shaffer before searching the remaining contents of the vehicle. He completed the affidavit as part of an application for a search warrant and gave the paperwork to Chief Derringer pursuant to the established Buffalo Township protocol. Chief Derringer took the completed application to Judge Shaffer for authorization. Judge Shaffer signed the application in two of the three locations but inadvertently failed to sign it in the third line calling for his signature. Chief Derringer then placed what he believed to be the authorized warrant in the mail slot for Officer Gillette's execution. Officer Gillette received what he believed to be a fully completed and duly authorized search warrant. He then executed the warrant and searched the Chrysler at the impound lot. The search yielded two pistols, a pair of handcuffs, a purse, a Michael Kors leather bag, a backpack, a Harley Davidson jacket, and numerous other items of personal property. Officer Gillette first became aware of the missing signature after Assistant United States Attorney Lenhardt informed him of the procedural irregularity.

A judicial officer's inadvertent "failure to sign a warrant affidavit does not require suppression of the evidence." United States v. Brookins, 413 F. App'x 509, 512 (3d Cir. 2011) (citing United States v. Smith, 63 F.3d 766, 769 (8th Cir. 1995); cf. United States v. Allen, 667 F. App'x 568, 569 (8th Cir. 2016) ("And contrary to Allen’s arguments, the Magistrate Judge’s failure to sign the jurat on the warrant application did not render the warrant defective - much less so defective that no police officer could reasonably have presumed the warrant was valid - given that the attesting law-enforcement officer was sworn and signed both the application and the affidavit in the presence of the Magistrate Judge, who also signed the attached supporting affidavit."). Instead, a showing of prejudice resulting in a Fourth Amendment violation must be established in order for such relief to be warranted. Brookins, 413 F. App'x at 512. Defendant cannot meet this standard.

Defendant has not demonstrated that he was unduly prejudiced in any manner. He has not made any persuasive argument that the application for the warrant was lacking in probable cause. The affidavit recounted Officer Gillette's initial 3:15 a.m. encounter with the individual standing near a parked vehicle at 113 Pasture Crossing; who was wearing dark clothing and "going through" the vehicle; the individual fleeing on foot upon an effort to make contact; encountering the recently parked Chrysler a few minutes later; encountering defendant driving the Chrysler a few minutes thereafter; defendant initially failing to yield to the activation of the patrol car lights and verbally protesting the stop; defendant emerging from the car with a sweaty face and muddy shoes and pants as though he had just run through grassy yards; the presence of dark gloves on the console and a dark sweatshirt in the back seat that appeared to be wet and dirty; the backpack on the passenger's seat containing loose coins, a coin organizer, a pistol magazine, gift/gas cards and a wallet with a driver's license belonging to a resident at 111 Pasture Crossing; and verification by the owner of the wallet that he had left it in his vehicle parked outside his residence and had not lent the vehicle to anyone.

The affidavit contained sufficient information to permit Judge Shaffer to believe probable cause existed. It is well-established that the role of a reviewing court in analyzing a magistrate judge's initial probable cause determination is to assess whether the magistrate judge had a substantial basis for concluding that probable cause existed. Illinois v. Gates, 462 U.S. 213, 238 (1983). The United States Court of Appeals for the Third Circuit has explained that "[reviewing courts] are constrained to determine only whether the affidavit provides a sufficient basis for the decision the magistrate judge actually made" and must refrain from engaging in *de novo* review as to whether probable cause actually existed. United States v. Jones, 994 F.2d 1051, 1057 (3d Cir. 1993) (recognizing that reviewing courts must refrain from making their own assessment as

to probable cause). If a substantial basis for the magistrate judge's determination exists, then that finding must be upheld notwithstanding the fact that "a different magistrate judge might have found the affidavit insufficient to support a warrant." United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993).

As explained above, the affidavit contained ample grounds for Judge Shaffer to conclude that it supplied probable cause for the issuance of the warrant. Judge Shaffer unequivocally indicated that he reviewed the affidavit, found probable cause for the requested warrant and intended to issue the warrant. Tr. 8:11-14. He simply made a mistake by failing to sign it at one of three locations. Tr: 11:1-5. And he did sign it at one of the two locations on page one. Tr. 15:19-24.

The irregularities that occurred in issuing the warrant did not result in or pertain to any violation of defendant's rights. Consequently, defendant is not entitled to suppression of the evidence seized pursuant to the execution of the warrant.

Finally, even assuming for the sake of argument that a substantial basis did not exist for the Judge Shaffer's probable cause determination and/or that the technical failure to sign the warrant at one location somehow impaired its legal force, the evidence obtained would nevertheless be admissible under the good faith exception to the exclusionary rule established in United States v. Leon, 468 U.S. 897 (1984). Under the good faith exception, suppression of evidence is “inappropriate when an officer executes a search in objectively reasonable reliance on a warrant’s authority.” United States v. Williams, 3 F.3d 69, 74 (3d Cir. 1993).

“The test for whether the good faith exception applies is whether a reasonably well trained officer would have known that the search was illegal despite the magistrate [judge’s] authorization.” Loy, 191 F.3d at 367 (quoting Leon, 468 U.S. at 922 n. 23). While the mere

existence of a warrant is typically enough to prove that an officer conducted a search in good faith, Leon, 468 U.S. at 922, the Third Circuit has recognized certain situations where an officer's reliance on a warrant nevertheless would be unreasonable and would not trigger the good faith exception:

> (1) [when] the magistrate [judge] issued the warrant in reliance on a deliberately or recklessly false affidavit;
> (2) [when] the magistrate [judge] abandoned his judicial role and failed to perform his neutral and detached function;
> (3) [when] the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or
> (4) [when] the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

Hodge, 246 F.3d 301 (internal quotations and citations omitted).

Defendant maintains that the good faith exception does not apply because Officer Gillette lacked a reasonable basis to believe that defendant had committed a crime when the backpack was searched without a warrant. Defendant seizes on the relatively short span of experience Officer Gillette had at the time of the encounter and arrest. And he asserts that at the time of the stop and the initial search of the backpack, Officer Gillette's assessments were not based on a showing of probable cause but instead were based on information that amounted to mere conjecture.

As previously discussed, Officer Gillette had reasonable suspicion to effectuate the stop of defendant. That reasonable suspicion ripened into probable cause to arrest during defendant exiting the vehicle and the securing of the scene. Furthermore, defendant has failed to identify any prejudice from the manner in which the warrant was authorized and/or executed. And the affidavit in support of the warrant was not so clearly lacking in probable cause that no reasonable police officer objectively could believe that, despite the magistrate judge's authorization, the law prohibited a search of the impounded vehicle for the listed evidence. See Zimmerman, 277 F.3d

426, 438 (3d Cir. 2002).  Thus, the good faith exception would be satisfied in any event and the evidence seized during the search of defendant's vehicle is not subject to suppression for this reason as well.

In short, Officer Gillette had reasonable suspicion to effectuate a stop of defendant, which ripened into probable cause to arrest after defendant was stopped.  The search of the backpack sitting in the passenger seat of the vehicle was lawful pursuant to the automobile and search-incident-to-arrest exceptions to the Fourth Amendment.  The affidavit presented to Judge Shaffer contained sufficient information from which he could have found and did find probable cause to believe that evidence of theft would be found in the Chrysler.  Defendant has failed to demonstrate that the technical irregularities which occurred as part of the authorization of the warrant violated his rights.  And the good faith exception would apply to the search conducted pursuant to the warrant in any event.  Accordingly, defendant's motion to suppress will be denied.  An appropriate order will follow.

Date: January 14, 2022

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc:    Ross E. Lenhardt, AUSA
       Steven C. Townsend, Esquire

       (*Via CM/ECF Electronic Mail*)